IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ADRIENNE JENSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-02422-JWL-TJJ |
| | ) | |
| UNITED STATES TENNIS ASSOCIATION ("USTA"), *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Comes now plaintiff Adrienne Jensen, by counsel, and makes the following complaint for damages as a result of the sexual abuse she suffered at the hands of Rex Haultain, a United States Tennis Association certified coach and an employee or agent of the Kansas City Racquet Club.[1]

### PARTIES

#### The Plaintiff

1. Plaintiff is a current resident of the State of Iowa, she can be contacted via her counsel, Saeed and Little, LLP, 133 W. Market Street #189, Indianapolis, Indiana, 46204.

#### The Defendants

2. Defendant United States Tennis Association ("USTA") is a New York corporation that can be served at 70 West Red Oak Lane, White Plains, New York, 10604.

---

[1] The Court granted Ms. Jensen leave to file this Amended Complaint in its Order at Dkt. No. 38.

1

3. Defendant Kansas City Racquet Club ("KCRC") is a Kansas corporation, owned by R & D Fitness Inc. KCRC may be served c/o Wade Ferguson or Anna Ferguson, 2707 W 141st Street, Leawood, KS 66224.[2]

4. Rex Haultain ("Coach Haultain"), during the events alleged below, was a resident of the State of Missouri.

## JURISDICTION AND VENUE

5. This case was originally filed in state court in Missouri. It was subsequently removed to the federal district court in the Western District of Missouri on the basis of both diversity jurisdiction and federal question jurisdiction. Thereafter, the case was transferred to the District of Kansas under 28 U.S.C. § 1404(a).

6. Jurisdiction and venue remain proper in this Court.

## NATURE OF THE COMPLAINT AND FACTS

7. Adrienne Jensen ("Ms. Jensen") began playing tennis when she was 3 or 4 years old.

8. Ms. Jensen began playing in USTA tournaments at 8 years old.

9. By 2009, at the age of 14, Ms. Jensen had become a nationally ranked player.

10. Ms. Jenson had aspirations to play tennis in college and in the Olympics and other tournaments.

11. The USTA is the National Governing Body ("NGB") for the sport of tennis in the United States.

---

[2] The original Complaint did not have the correct corporate information for this Defendant. This information corrects the ownership and address of KCRC.

12. Membership in the USTA is required for those that wish to compete in the Olympic Games.

13. The USTA is responsible for maintaining a national ranking of tennis players in the United States.

14. A player's ranking is vital in determining if players are accepted into tournaments.

15. USTA is responsible for certifying coaches in the United States.

16. The United States Olympic Committee ("USOC") requires all NGBs, including the USTA, to train all its adult members, including coaches, officials, and umpires, on sexual abuse and sexual abuse prevention.

17. The sexual abuse of minors by individuals in authority positions over them is a well-known problem in the United States.

18. The calculated cover-ups by groups like the Catholic Church, Little League, and the Boy Scouts was national news for decades prior to 2010.

19. Major media outlets have been reporting on sexual abuse in USOC-controlled NGBs, particularly United States Swimming and United States Gymnastics, since the early-1990s.

20. By 2010, sexual abuse in sports controlled by the USOC was an undeniable epidemic.[3]

21. In 2010, the USOC commissioned a task force ("USOC Task Force") to prevent sexual abuse in sports controlled by the USOC and its NGBs.

---

[3] USA Swimming was featured on ABC's 20/20 in early 2010
https://www.youtube.com/watch?v=GqmzMtp6iyw

22. The leader of the USOC Task Force understood the importance of her work, telling The New York Times that sexual abuse of minors in NGB-controlled sports is a, "grass-roots problem" affecting "one million" kids. Lynn Zinser, U.S.O.C. to Take Steps to Protect Against Sexual Abuse, N.Y. TIMES, Sept. 28, 2010, at https://www.nytimes.com/2010/09/29/sports/29usoc.html.

23. The 2010 USOC Task Force suggested that the NGBs "implement new policies, safeguards, and protective practices within six months." *Id.*

24. The then-CEO of the USOC, Scott Blackmon, believed that the USOC and its NGBs would implement the changes suggested by the Task Force within six months.

25. The USOC Task Force recommended that the NGBs, including USTA:

   a. Develop policies and procedures to define and prohibit sexual abuse;
   b. Develop education training and programs for their adult members; and
   c. Develop policies and procedures for minors to report sexual abuse.

26. On December 7, 2012, F. Skip Gilbert, then-Managing Director of the USTA, sent a letter to Scott Blackmun then CEO of the United States Olympic Committee, admitting that the USTA interacted with its members and coaches "on a daily basis" and had "access to them". [*See* Ex. A, attached.]

27. In his letter, Gilbert complaint that the "USOC Board's proposal to mandate 'minimum' SafeSport standards" was misguided and could cause the USTA to lose recognition or performance funding. [*Id.*]

28. Gilbert went to on to say that "the USTA [had] been developing and enforcing [their] own policies for many years, long before the USOC . . . contemplated the SafeSport program." [*Id.*]

4

29. On December 11, 2012, Mr. Blackmun responded to Mr. Gilbert, stating: "Given the seriousness of the issue and the horrifying incidents that have surfaced over the last two or three years, I am finding it hard to fathom that you would equate the proposed policy with bullying and harassment." [*See* Exhibit B, attached.]

30. Mr. Blackmun went on to acknowledge the "very serious problem" of abuse in sport and stated that "almost everybody has expressed strong support" of the USOC's initiative. [*Id.*]

31. Both Mr. Blackmun and the board chairman of the United States Olympic Committee were "taken aback by the disagreeable tone of [USTA's] letter." [*Id.*]

32. On December 13, 2012, Mr. Gilbert replied, reiterating that, "[f]or many years" the USTA had "been a leader in implementing robust policies and procedures to ensure" the growth of its sport "while mitigating any risk of misconduct." [*See* Exhibit C, attached.]

33. The USTA failed to implement any of the changes suggested by the Task Force.

34. The USTA failed (apparently, to this date of this Complaint) to list their banned coach members publicly[4]. To the contrary, as of the date of this Complaint, the USTA still lists Coach Haultain as an award-winning contributor to the Youth High Performance Program.

35. The USTA implemented a Safe Sport Program called "Safe Play" sometime in or after 2014.

36. Upon information and belief, the USTA had no Safe Sport program until 2014.

---

[4] Buried on USTA's website one is able to search a coach's name to see if that coach is in compliance with USA Tennis' Safe Play program – but does not contain a list of banned coaches. https://www.usta.com/en/home/safe-play.html, the net result of listing coaches this way is that parents would have no way of knowing that coaches like Rex Haultain banned from membership in United States Tennis – they would simply get a no results found when searching for his name in the Safe Play database.

**Defendants' Lack of Concern for Safety of Minor Members**

37. By 2010, the KCRC should have had a policy requiring that its adult employees not be alone with children.

38. In 2010, the USTA did not have a policy prohibiting its certified coaches from being alone with children.

39. In 2010, the USTA did not have a policy prohibiting the coaches it certified from traveling alone with children to tournaments it sanctioned.

40. In 2010, the KCRC did not have a policy prohibiting its adult employees from traveling alone to tournaments with children.

41. In 2010, the USTA did not have a policy prohibiting its certified coaches from texting minor athletes.

42. In 2010, the KCRC did not have a policy prohibiting its adult employees from sending texts, including sexually explicit texts, to its minor members.

43. Coach Haultin was a USTA-certified coach and agent of the USTA at all relevant times.

44. Coach Haultin was an employee or agent of the KCRC at all relevant times.

45. Ms. Jensen was a member of both the USTA and the KCRC at all relevant times.

**Both Defendants Derived Financial and Other Value from Ms. Jensen's Membership**

46. Ms. Jensen paid dues to the USTA.

47. Ms. Jensen purchased insurance from the USTA.

48. Ms. Jensen purchased specific insurance for sexual abuse from the USTA.

49. Ms. Jensen paid membership fees and dues to the KCRC.

50. Both Defendants benefitted from having an athlete of Ms. Jensen's caliber among their members.

**Due to Defendants' Lack of Care Coach Haultain Groomed and Molested Ms. Jensen**

51. In August of 2009, Ms. Jensen moved to Kansas City to train with Coach Haultain, a renowned coach from New Zealand who was working for the KCRC.

52. The coach-athlete relationship between Ms. Jensen and USTA-certified coach Haultain started off appropriately.

53. Ms. Jensen thought highly of Coach Haultain and wanted to do whatever she could to please him.

54. Coach Haultain was aware of how much Ms. Jensen looked up to him.

55. Coach Haultain exploited her admiration and respect.

56. Coach Haultain slowly and methodically groomed and manipulated Ms. Jensen.

57. Coach Haultin began developing situations where he could be alone with Ms. Jensen.

58. The KCRC allowed Coach Haultain to be alone with Ms. Jensen at its facility.

59. The USTA allowed their certified coach, Rex Haultain, to be alone with Ms. Jensen at tournaments and competitions that the USTA sanctioned.

60. Coach Haultain regularly took Ms. Jensen to facilities in Kansas City, Missouri and St. Louis, Missouri for training and to participate in tournaments.

61. In 2009, Coach Haultain began texting Ms. Jensen. His texting occurred away from practice, often in the evenings. On information and belief, much or most of his texting occurred while he was at his residence or while otherwise in Missouri.

62. Throughout 2010, these text messages increased in frequency.

63. At first, the text messages came on holidays. Then, in 2010, Coach Haultain began texting more frequently and ultimately daily.

64. The messages went from praising Ms. Jensen's tennis skills to praising her body and appearance.

65. Coach Haultain said they (he and Ms. Jensen) would be together forever.

66. Coach Haultain said he would take Ms. Jensen away to Mexico.

67. Coach Haultain described his long-term fantasies and told Ms. Jensen he loved her.

68. Coach Haultain made Ms. Jensen feel like she needed him, not just athletically, but emotionally as well.

69. Ms. Jensen feared her performance would fall off if she stopped training with Coach Haultain.

70. Coach Haultain sought out and cultivated a sexually exploitative "relationship" with the 15-year-old Ms. Jensen.[5]

71. As this inappropriate behavior continued, every three weeks or so, they would have "The Talk".

72. "The Talk" was Coach Haultain making increasing demands on her, not from her athletically, but from her sexually.

73. Ms. Jensen understood this as a covert way of requesting nude photos, sexual favors, or to motivate Coach Haultain to send her photos of his penis.

---

[5] The use of the term "relationship" should not be interpreted as implying that Ms. Jensen was able to consent to having a sexual relationship as a minor.

74. Coach Haultain solicited Ms. Jensen on numerous occasions to send him nude photos, as well as showing her photos of his penis.

75. Ms. Jensen would sometimes oblige and send Coach Haultain photographs in her bra and underwear.

76. Ms. Jensen felt immense pressure to please Coach Haultain, it affected her personal life, and performance on the court.

77. Ms. Jensen felt the pressure building to engage in sexual acts with her coach after every text message, inappropriate action, and conversation with Coach Haultain.

78. Coach Haultain continued to mentally break Ms. Jensen down. He would alternate between yelling at Ms. Jensen and then ignoring her. He would scream at Ms. Jensen, tell her she was pathetic, not good enough, and a disgrace before banishing her to a different court as a way of punishing her. Then, he would text her at night acting as if he had not spent the day verbally and emotionally abusing Ms. Jensen.

79. Ms. Jensen felt the pressure building up from every text message and inappropriate action done by Coach Haultain.

80. Coach Haultain also would take Ms. Jensen out of state by means of the Kansas City International Airport for tournaments.

81. During a plane ride, on their way to Las Vegas, Nevada, in May of 2010, Coach Haultain put Ms. Jensen's hand on his penis while she pretended to be asleep.

82. Ms. Jensen was mortified and took her hand away, however, he only took it again and placed it back onto his penis.

83. In July of 2010, at a tournament in Alabama, Coach Haultain came into Ms. Jensen's hotel room to give her a back massage.

84. Coach Haultain noticed Ms. Jensen had her sports bra on and told her to go into the bathroom to take it off.

85. After Coach Haultain continued to mentally break Ms. Jensen down, she had a breakdown on the court at practice in the summer of 2010.

86. Coach Haultain complained that she was not ready for a relationship and he would stop trying.

87. Coach Haultain would respond with anger and punish Ms. Jensen at practice when she would not engage with his sexual advances. He would yell at and verbally demean Ms. Jensen before sending her to a different court and refusing to speak to her. Ms. Jensen would have to approach and engage Haultain in order to reestablish communication and coaching.

88. Coach Haultain did not stop trying to cultivate a sexual relationship with Ms. Jensen.

89. Ms. Jensen did not want to play poorly for fear of how her coach would react.

90. When Ms. Jensen did not perform as Coach Haultain expected, he would punish her with extra physical training and would be verbally abusive to her at practice.

91. Ms. Jensen was trapped by Coach Haultain and subjected to his ongoing abuse because his coaching and connections in the tennis world were a vital component of her athletic success.

92. During these summer months, Coach Haultain would punish Ms. Jensen if she wasn't playing as well as he thought she should; he would yell at her, demean her, put her on courts with players who were not at her level, and would tell her how "pitiful," "horrible," and "disgusting" her tennis was.

10

93. After these terribly difficult days on the court during the practices in the summer of 2010, Coach Haultain would text her at nighttime, acting as though the verbal and emotional abuse on the court never occurred.

94. Players who Ms. Jensen practiced with noticed the ways in which Coach Haultain treated her.

95. One boy, even yelled at practice one afternoon, "Why is Rex so fixated with you?"

96. Ms. Jensen remembers parents and other players staring at her and Coach Haultain.

97. She did not want play poorly in fear of how he would treat her.

98. Ms. Jensen continued to endure the abusive situation with Coach Haultain due to her confusion and to mitigate the verbal and emotional abuse she would endure on the court.

99. On the way to St. Louis in the fall of 2010, Coach Haultain stroked her leg in the car.

100. Ms. Jensen did not say anything because she did not want to upset him.

101. When he was upset with her, Coach Haultain lashed out at Ms. Jensen, causing to her suffer serious mental and physical harm.

102. The pressure to perform athletically and sexually for her coach was so bad that at tournament in St. Louis, Ms. Jensen's confidence was extremely low, her mental state was unwell, and she could not play tennis.

103. Ms. Jensen could not play or focus because of the severe psychological stress that Coach Haultain subjected her to. Ms. Jensen was terrified of what she would have to endure off the court.

104. Before Ms. Jensen's first match in St. Louis, Haultain demanded to know what color underwear she was wearing, the color of her pubic hair, and description of her breasts. Ms. Jensen, with tears in her eyes, could not even respond when the tournament director called her name.

105. Ms. Jensen feared being on the court and being watched by Coach Haultain who also constantly told her she "wasn't good enough" and further feared being off the court and continually subjected to his sexual harassment and abuse.

106. Coach Haultain later came to her hotel room and lay on her bed. Ms. Jensen had suicidal thoughts, she wanted to escape what had become reality.

107. Ultimately, Ms. Jensen withdrew from the tournament after being up all night crying due to Haultain's abuse.

108. In December 2010, while they were in Arizona for a tournament, Ms. Jensen was watching a movie in her room and Coach Haultain came and lay on her bed again.

109. Coach Haultain began to hug Ms. Jensen tightly.

110. Coach Haultain gradually became more sexual.

111. Coach Haultain reached his hands in Ms. Jensen's pants.

112. Coach Haultain began rubbing Ms. Jensen's buttocks and then her vagina.

113. Coach Haultain told Ms. Jensen, "Just go with it," as Ms. Jensen cried.

114. The next day, after her matches, Coach Haultian trapped Ms. Jensen in her hotel room.

115. This time Coach Haultin went even further with her sexually.

116. Ms. Jensen did not know how to tell him, "No."

117. Ms. Jensen was afraid that Coach Haultain would seek physical and psychological retribution if she denied his sexual advances.

118. Coach Haultain digitally penetrated Ms. Jensen's vagina.

119. After their trip to Arizona in late 2010, Coach Haultain continued to pursue Ms. Jensen.

120. Coach Haultain would talk to Ms. Jensen between matches in Arizona, making her promise that she would not tell anyone what he had done.

121. Coach Haultain told Ms. Jensen he feared he would get caught, but he did not stop his inappropriate and criminal behavior with Ms. Jensen.

122. Haultain told Ms. Jensen not to tell anyone about his behaviors because he did not want the tennis community to learn the truth about him.

123. Coach Haultain told Ms. Jensen he wished she didn't see him as a father figure, and wished they were the same age.

124. Coach Haultain got mad when Ms. Jensen went on dates with boys her age.

125. Coach Haultain demanded Ms. Jensen buy different underwear and tell him what color she was wearing during practice so he would have something to think about.

126. In August 2010, Haultain picked up Ms. Jensen and her sister from their apartment to travel to San Diego, CA, where Ms. Jensen would compete in Hard Court Nationals.

127. While they were driving to Kansas City International Airport, Coach Haultain showed Ms. Jensen pictures of his penis, even though her sister was in the backseat of the car. Ms. Jensen felt helpless because her sister was in such close proximity during Haultain's graphic sexually inappropriate behavior.

128. Coach Haultain often would tell Ms. Jensen that she made him "hard". In one instance, while at the tournament in San Diego, he made Ms. Jensen walk around the facility with him while he told her how "hard" she made him and whether she "was aware of what she did to him." Haultain's constant harassment and abuse made Ms. Jensen feel that it was her fault.

129. Coach Haultain would beg Ms. Jensen to look at photos of his penis.

130. Ms. Jensen would look at Coach Haultain's photos to appease his demands but would feel sick to her stomach that someone her dad's age was doing this.

131. Coach Haultain's sexual, verbal, physical, and mental abuse continued until his arrest.

132. After Coach Haultian's arrest and conviction, Ms. Jensen could no longer trust her coaches when she returned to the sport.

133. Coach Haultain stole Ms. Jensen's time, happiness, mental health, passion for tennis, and her innocence.

134. Ms. Jensen has experienced anxiety, depression, guilt, and mental anguish as the result of Coach Haultain's actions.

135. It was not until recently that Ms. Jensen began to connect her mental injuries to her abuse.

136. Coach Haultain pled guilty to one Federal Count of soliciting child pornography and was ultimately sentenced to prison and subsequently deported to New Zealand.[6]

---

[6] https://archives.fbi.gov/archives/kansascity/press-releases/2013/girls-former-tennis-coach-sentenced-for-soliciting-her-for-child-pornography

# CLAIMS FOR RELIEF

## Count 1: Negligence
*Plaintiff v. USTA*

137.  Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

138.  The USTA knew that its athletes were particularly susceptible to physical and sexual abuse by their coaches and others in authority over them.

139.  The USTA had a duty to protect Adrienne Jensen, who was a paying member of the USTA, and all other minor members from sexual abuse, battery, harassment, and exploitation by USTA certified, member coaches, including Haultain.

140.  The USTA breached this duty.

141.  The USTA was negligent in its retention, supervision, endorsement, and credentialing of Rex Haultain and by failing to implement policies and procedures to prevent child sexual abuse.

142.  As a direct and proximate result of the USTA's actions, Haultain sexually assaulted, molested, harassed, battered, and physically and emotionally abused Adrienne Jensen, a minor, resulting in severe emotional distress and economic losses, and these injuries continue.

## Count 2: Negligence
*Plaintiff v. KCRC*

143.  Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

144.  The KCRC had a duty to protect Adrienne Jensen, who was a paying member of the KCRC, and all other minor athletes using their facility from sexual abuse, battery, harassment, and exploitation by Rex Haultain, the agent and/or employee of KCRC.

145.  The KCRC breached this duty.

146. The KCRC was negligent in its retention, supervision, endorsement, and credentialing of Rex Haultain and by failing to implement policies and procedures to prevent child sexual abuse.

147. As a direct and proximate result of the KCRC's actions, Haultain sexually assaulted, molested, harassed, battered, and physically and emotionally abused Adrienne Jensen, a minor, resulting in severe emotional distress and economic losses, and these injuries continue.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays for the following relief:

a. That judgment be entered in favor of Plaintiff and against Defendants;

b. That Plaintiff be awarded damages in such amounts as fairly compensates her for injuries;

c. That Plaintiff be awarded pre-judgment and post-judgment interest;

d. That Plaintiff be awarded her actual expenses of litigation, including reasonable attorney's fees;

e. Injunctive relief, requiring the USTA to put in place supervision and compliance protocols that actually prevent, uncover, and stop the disregard of the safety of athletes, minors, and their families; and

f. That Plaintiff be awarded such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a jury trial in this matter.

Respectfully submitted,

/s/ Chris Dove
Christopher Dove     KS #21251
DRZ LAW, LLC
8700 State Line, Suite 305
Leawood, KS 66206
913-400-2033
chris@drzlawfirm.com

Jonathan Little (admitted *pro hac vice*)
Annemarie C. Alonso  (admitted *pro hac vice*)
Saeed and Little, LLP
133 W. Market St., #189
Indianapolis, IN 46204
317-721-9214
jon@sllawfirm.com
annie@sllawfirm.com